RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0135p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JAE LEE,

        *Petitioner-Appellant,*

    *v.*

UNITED STATES OF AMERICA,

        *Respondent-Appellee.*

No. 14-5369

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
Nos. 2:09-cr-20011-1; 2:10-cv-02698—John Thomas Fowlkes, Jr., District Judge.

Argued: January 28, 2016

Decided and Filed: June 8, 2016

Before: NORRIS, BATCHELDER, and SUTTON, Circuit Judges.

---

## COUNSEL

**ARGUED:** Patrick T. McNally, WEATHERLY, MCNALLY & DIXON, PLC, Nashville, Tennessee, for Appellant. Kevin P. Whitmore, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellee. **ON BRIEF:** Patrick T. McNally, WEATHERLY, MCNALLY & DIXON, PLC, Nashville, Tennessee, for Appellant. Kevin P. Whitmore, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellee.

---

## OPINION

---

ALICE M. BATCHELDER, Circuit Judge. Jae Lee, now 47 years old, moved to the United States from South Korea with his family in 1982 and has lived here legally ever since. After completing high school in New York, he relocated to Memphis, Tennessee, where he

became a successful restaurateur. He also became a small-time drug dealer, and, in 2009, following a sting operation, he was charged with possession of ecstasy with intent to distribute in violation of 21 U.S.C. § 841(a)(1).

The case against him was very strong. A government witness was prepared to testify that he had purchased ecstasy from Lee on a number of occasions, dozens of pills were discovered during a lawful search of Lee's home, and Lee himself admitted not only that he had possessed ecstasy, but also that he had distributed the drug to his friends. In light of this, Lee's trial attorney advised him to plead guilty in exchange for a lighter sentence.

Here's the wrinkle: even though he has lived in the United States for decades, Lee, unlike his parents, never became an American citizen, and though he did eventually plead guilty, he did so only after his lawyer assured him that he would not be subject to deportation—"removal," in the argot of contemporary immigration law. This advice was wrong: possession of ecstasy with intent to distribute is an "aggravated felony," rendering Lee deportable. *See* 8 U.S.C. §§ 1101(a)(43)(B), 1227(a)(2)(A)(iii). Lee understandably does not want to be deported, and he filed a motion to vacate his conviction and sentence under 28 U.S.C. § 2255, contending that he received ineffective assistance of counsel.

We evaluate claims of ineffective assistance of counsel using the familiar two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984): (1) Was the attorney's performance deficient? And (2) did the deficient performance prejudice the defense? The government concedes that Lee has satisfied the first prong, so the only question we have to decide on this appeal is whether Lee has met the high bar of demonstrating prejudice. *See id.* at 693–95. To prevail, he must show "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). "The test is objective, not subjective; and thus, 'to obtain relief on this type of claim, a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances.'" *Pilla v. United States*, 668 F.3d 368, 373 (6th Cir. 2012) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010)).

Whether Lee has satisfied this standard is not immediately obvious.  On the one hand, the district court's conclusion that the evidence of guilt was "overwhelming" is not clearly erroneous, and deportation would have followed just as readily from a jury conviction as from a guilty plea.  Thus, aside from the off chance of jury nullification or the like, Lee stood to gain nothing from going to trial but more prison time.  On the other hand, for those such as Lee who have made this country their home for decades, deportation is a very severe consequence, "the equivalent of banishment or exile," as the Supreme Court memorably put it.  *Delgadillo v. Carmichael*, 332 U.S. 388, 391 (1947).  As a factual matter, we do not doubt Lee's contention that many defendants in his position, had they received accurate advice from counsel, would have decided to risk a longer prison sentence in order to take their chances at trial, slim though they were.

But would such a decision be "rational"?  Several courts, including this circuit, have said "no": being denied the chance to throw "a Hail Mary" at trial does not by itself amount to prejudice.  *See Pilla*, 668 F.3d at 373; *Haddad v. United States*, 486 F. App'x 517, 521–22 (6th Cir. 2012); *see also, e.g.*, *Kovacs v. United States*, 744 F.3d 44, 52–53 (2d Cir. 2014); *United States v. Akinsade*, 686 F.3d 248, 255–56 (4th Cir. 2012); *United States v. Kayode*, 777 F.3d 719, 724–29 (5th Cir. 2014).

Others have reached the opposite conclusion.  *See, e.g.*, *United States v. Orocio*, 645 F.3d 630, 643–46 (3d Cir. 2011), *abrogated on other grounds by Chaidez v. United States*, 133 S. Ct. 1103 (2013); *DeBartolo v. United States*, 790 F.3d 775, 777–80 (7th Cir. 2015); *United States v. Rodriguez-Vega*, 797 F.3d 781, 789–90 (9th Cir. 2015); *Hernandez v. United States*, 778 F.3d 1230, 1234 (11th Cir. 2015).

We have no ability, of course, as a panel, to change camps.  And in that sense, this is a straightforward case.  In *Pilla* we held that no rational defendant charged with a deportable offense and facing "overwhelming evidence" of guilt would proceed to trial rather than take a plea deal with a shorter prison sentence.  668 F.3d at 373.  Lee finds himself in precisely this position, and he must therefore lose.  But given the growing circuit split (which, as best we can tell, has gone unacknowledged), we think it worthwhile to explain why we are convinced that

our approach is the right one and to set out the role that we believe deportation consequences should play in evaluating prejudice under *Strickland*.

We begin, however, by giving the other side its due. As the Seventh Circuit noted in *DeBartolo*, strong evidence of guilt does not strip a defendant of his right to a jury trial, nor does it guarantee a guilty verdict. 790 F.3d at 779. The second point is especially true for defendants such as Lee, since it is well documented that many jurors are willing to acquit those charged with a first-time, non-violent drug offense, despite evidence of guilt. *See id.* (quoting Lawrence D. Bobo & Victor Thompson, *Racialized Mass Incarceration: Poverty, Prejudice, and Punishment*, *in Doing Race: 21 Essays for the 21st Century* 343 (Hazel R. Markus & Paula Moya eds., 2010)).

This possibility, at least according to many of this nation's founders, is not a defect, but a feature of the jury system. *See, e.g.*, 2 John Adams, *The Works of John Adams* 254–55 (1850) ("It is not only [the juror's] right, but his duty . . . to find the verdict according to his own best understanding, judgment, and conscience, though in direct opposition to the direction of the court." (Diary Entry, February 12, 1771)). Indeed, the unreviewable power of juries to acquit, despite strong evidence of guilt, was perhaps the *central* reason why the right to a jury trial in criminal cases was enshrined in the Constitution. *See* Rachel E. Barkow, *Criminal Trials*, *in The Heritage Guide to the Constitution* 340, 340–41 (David F. Forte & Matthew Spalding, eds. 2nd ed. 2014). For the framers and ratifiers, the memory of how King George III had prevented colonial juries from nullifying unpopular English laws by "expand[ing] the jurisdiction of non-jury courts" was still fresh. *Id.* at 340. And one of the grievances listed in the Declaration of Independence was that the King had "depriv[ed] us in many cases, of the benefits of Trial by Jury." *Declaration of Independence* para. 20 (U.S. 1776). It is thus not surprising that nearly all commentators active during the time of the founding favored the inclusion in the new Constitution of the right to a jury trial. *See, e.g.*, *The Federalist No. 83*, at 432–33 (Alexander Hamilton) (The Gideon ed., George W. Carey & James McClellan eds., Liberty Fund 2001) ("The friends and adversaries of the plan of the convention, if they agree in nothing else, concur

at least in the value they set upon the trial by jury.").**[1]**  By codifying the right to a jury trial in criminal cases, the Constitution secured a key role for "the People"—specifically, the people "of the State and district wherein the crime shall have been committed," U.S. Const. amend. VI—in the judicial process, providing an effective check on the ability of oppressive and distant legislators, overzealous prosecutors, and unfair judges to contravene local sentiment.

This attitude towards juries has long since fallen into disfavor, but the use of juries has not.  Nor has it ceased to be true that, as G.K. Chesterton once noted, we rely on juries not because they are made up of legal experts, but precisely because they are not.  *See* G.K. Chesterton, *The Twelve Men*, *in Tremendous Trifles* 80, 86–87 (1909), *available at http://www.chesterton.org/twelve-men/*.  As he put it,

> Our civilisation has decided, and very justly decided, that determining the guilt or innocence of men is a thing too important to be trusted to trained men.  [When it] wishes for light upon that awful matter, it asks men who know no more law than I know, but who can feel the things that I felt in the jury box.

*Id.*

We nevertheless respectfully disagree with our colleagues on the Seventh Circuit that jury nullification may be considered when evaluating whether a petitioner has shown *Strickland* prejudice.  We reach this conclusion for the straightforward reason that *Strickland* itself has taken the matter out of our hands: "A defendant has no entitlement to the luck of a lawless decisionmaker."  466 U.S. at 695.  And we must therefore exclude from our analysis "the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like."  *Id.*  Such possibilities, real as they are, "are irrelevant to the prejudice inquiry" under *Strickland*.  *Id.*  Unfortunately for Lee, "the luck of the lawless decisionmaker" is all he has going for him.  Nothing in the record suggests that he would have been acquitted at trial, *cf. Hill*, 474 U.S. at 59–60, or would have been able to obtain a conviction for an offense that did not require deportation, *cf. Missouri v. Frye*, 132 S. Ct. 1399, 1409–10 (2012); *Kovacs*, 744 F.3d at 51–52.

---

**[1]**This high regard for juries dovetails with eighteenth-century jurists' dislike of guilty pleas.  Blackstone, for example, said that courts were usually "very backward in receiving and recording" them and should usually see to it that they were withdrawn.  4 William Blackstone, *Commentaries* *329.

Similarly, while we recognize the possibility that the prosecutor might have agreed to allow Lee to plead guilty to a non-deportable offense if his attorney had pursued the matter, this is sheer speculation. Again, there is nothing in the record before us indicating that such an attempt would have changed the ultimate outcome of Lee's case. *See Hill*, 474 U.S. at 59.

Lee, together with the courts that have reached the opposite conclusion, counters that deportation changes the calculus because "[p]reserving the client's right to remain in the United States may be more important to the client than any potential jail sentence." *Orocio*, 645 F.3d at 645 (quoting *Padilla*, 559 U.S. at 368) (internal quotation marks and emphasis omitted; brackets in original). This statement is true enough. And we agree that a "reasonable" non-citizen charged with a deportation-triggering offense will, if properly advised, consider deportation consequences in deciding whether to plead guilty and might, as a result, be willing to go to trial even if he faces a low probability of success, one that might lead a citizen to accept a plea. This consideration is thus a "special circumstance[]" relevant to the prejudice inquiry. *Hill*, 474 U.S. at 60. But it does not follow from this that a decision to reject a plea deal that would trigger deportation consequences is *ipso facto* "rational under the circumstances" regardless of the merits of the defense.

To begin with, there is no way to square such a conclusion with *Strickland*'s admonition that courts may not consider jury nullification or happenstance when deciding whether a petitioner has demonstrated prejudice. Lee's reasoning, moreover, takes the quotation from *Padilla* out of context: when *Padilla* emphasized the importance of deportation consequences to the plea calculus, it did so in the context of analyzing the deficient-performance prong, not the prejudice prong. This is significant because the Court declined to craft a deportation-specific prejudice rule to go along with its deportation-specific performance rule. Indeed, it declined to do so even though the claimant in that case, like Lee, had lived in the United States legally for decades and had alleged that "he would have insisted on going to trial if he had not received incorrect advice from his attorney." *Padilla*, 559 U.S. at 359. While this is much the same as the statements that other courts have held sufficient to show prejudice, *see, e.g., Hernandez*, 778 F.3d at 1234, the Supreme Court not only declined to decide the point, but it also emphasized "the fact that it is often quite difficult for petitioners who have acknowledged their

guilt to satisfy *Strickland*'s prejudice prong." 559 U.S. at 371 n.12. The Court had no reason to say this if Lee's approach is correct.

Indeed, that approach would elide the difficult task of showing prejudice entirely since it would provide those in Lee's position with a ready-made means of vacating their convictions *whenever* they can show that counsel failed to adequately explain deportation consequences. The government may find it harder to re-prosecute (and eventually to deport) given the lapse of time, and it may have less motivation to do so since the claimant will have already served a prison sentence. This would geld the "strong presumption" against ineffective-assistance claims, *Strickland*, 466 U.S. at 696, and it is out of step with the rule that prejudice requires showing a "substantial, not just conceivable," chance of a different result, *Harrington v. Richter*, 562 U.S. 86, 112 (2011). Further, if Lee is right, might not competent defense counsel decide in some cases that acting *incompetently* is better? *Cf. DeBartolo*, 790 F.3d at 780. That possibility weighs against Lee's approach, as the Supreme Court has made clear that ineffective-assistance claims must not "threaten the integrity of the very adversary process the right to counsel is meant to serve." *Harrington*, 562 U.S. at 105.

In other words, the merits matter. And we therefore join the Second, Fourth, and Fifth Circuits in holding that a claimant's ties to the United States should be taken into account in evaluating, *alongside the legal merits*, whether counsel's bad advice caused prejudice. *See, e.g.*, *Kovacs*, 744 F.3d at 52; *Akinsade*, 686 F.3d at 255–56; *Kayode*, 777 F.3d at 725. The problem for Lee is that he has no *bona fide* defense, not even a weak one. Thus, despite his very strong ties to the United States, he cannot show prejudice.

In reaching this conclusion, we should not be read as endorsing Lee's impending deportation. It is unclear to us why it is in our national interests—much less the interests of justice—to exile a productive member of our society to a country he hasn't lived in since childhood for committing a relatively small-time drug offense. But our duty is neither to prosecute nor to pardon; it is simply to say "what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). Having discharged that duty, we affirm the district court's denial of Lee's § 2255 motion to vacate his conviction and sentence.