**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-7616**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

PHILIP SWABY,

Defendant - Appellant.

**No. 15-7621**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

PHILIP SWABY,

Defendant - Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore. Richard D. Bennett, District Judge.  (1:11-cr-00607-RDB-2; 1:15-cv-02657-RDB)

Argued:  December 7, 2016                                 Decided:  April 24, 2017

Before GREGORY, Chief Judge, and WYNN and THACKER, Circuit Judges.

———————

Reversed, vacated, and remanded by published opinion. Chief Judge Gregory wrote the opinion, in which Judge Wynn and Judge Thacker joined.

———————

ARGUED: Bradley Nelson Garcia, O'MELVENY & MYERS LLP, Washington, D.C., for Appellant. Aaron Simcha Jon Zelinsky, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. ON BRIEF: Jeremy Maltby, David K. Roberts, O'MELVENY & MYERS LLP, Washington, D.C., for Appellant. Rod J. Rosenstein, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

———————

GREGORY, Chief Judge:

Philip Swaby brings a Sixth Amendment ineffective assistance of counsel challenge to his conviction, which led to his deportation as an aggravated felon. While Swaby's counsel provided deficient performance, the district court determined that the deficient performance did not prejudice his defense because the court corrected his counsel's deficiencies. For the reasons below, we reverse the district court's dismissal, grant Swaby's habeas petition, and remand for further proceedings.

I.

A.

Philip Swaby is a citizen of Jamaica, and had been a lawful permanent resident of the United States since June 6, 2001. He is married to a U.S. resident, has two daughters who are U.S. citizens, and acts as a father to his wife's daughter from a prior marriage.

On November 10, 2011, Swaby and his then-girlfriend, now-wife, Ms. Robinson, were indicted for trafficking in counterfeit goods under 18 U.S.C. § 2320 and conspiracy to traffic in counterfeit goods. According to the indictment, Swaby and Robinson sold counterfeit merchandise from a store called Fashion Trendz. They had counterfeit purses, handbags, and other merchandise; counterfeit labels for expensive brand names; and generic merchandise bearing no labels.

Peter Ward served as Swaby's appointed counsel. Ward immediately recognized that "immigration status would be a significant consideration" for Swaby, who had a green card and intended to apply for U.S. citizenship. J.A. 147. And from the beginning

3

of the representation, Swaby "[wa]s concerned and ha[d] always been concerned about his immigration status." J.A. 83.

Under federal immigration law, any alien convicted of an "aggravated felony" is deportable. 8 U.S.C. § 1227(a)(iii). Aliens rendered deportable because of an aggravated felony are ineligible for asylum or cancellation of removal. *Moncrieffe v. Holder*, 133 S. Ct. 1678, 1682 (2013). Indeed, deportation is so likely for those convicted of an aggravated felony that it is akin to "mandatory deportation." *United States v. Akinsade*, 686 F.3d 248, 254 (4th Cir. 2012). One such aggravated felony that triggers mandatory deportation is an offense involving counterfeiting for which the term of imprisonment is greater than one year. 8 U.S.C. § 1101(a)(43)(R). A second aggravated felony is one that "involves fraud or deceit in which the loss to the victim or victims exceeds $10,000." 8 U.S.C. § 1101(a)(43)(M)(i).

Recognizing that he lacked expertise in immigration law, Ward contacted Mary Ann Berlin, an immigration lawyer, for advice. He sent her a copy of Swaby's indictment and the relevant criminal statute.

Berlin immediately recognized that Swaby needed to avoid conviction of an aggravated felony. She first advised Ward that Swaby's sentence must be under one year in order to avoid categorization as an aggravated felony. When looking at the criminal counterfeiting statute, she saw that 18 U.S.C. § 2320(a)(2) prohibited trafficking of counterfeit merchandise "the use of which is likely . . . to deceive." Conversely, § 2320(a)(1) lacked any "deceit' or "fraud" language, and thus would not be an aggravated felony for immigration purposes under 8 U.S.C. § 1101(a)(43)(M)(i). She

4

advised Ward accordingly, and based on this advice Ward negotiated a plea agreement where Swaby would plead guilty to 18 U.S.C. § 2320(a)(1) and agree to pay $14,220 in restitution. His sentence was 364 days long.

Unfortunately, Berlin had looked at an amended version of § 2320(a)(1) that did not apply to Swaby's case.[1] Based on the version of the statute applicable to Swaby's case, 18 U.S.C. § 2320(a)(1)'s language included deception. As a result, Swaby unknowingly pleaded to an aggravated felony that rendered him automatically deportable.

Swaby's plea agreement bore the broad warning about immigration consequences that is common to many plea agreements:

> By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status. . . . [C]onviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. . . . Defendant understands that no one, including his attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any potential immigration consequences.

J.A. 34. And at Swaby's plea hearing, the district court recited the warning commonly heard at such proceedings: "You should understand that, by pleading guilty this afternoon, you may be essentially doing something that will lead to your deportation or removal from the United States." J.A. 49. The district court also referenced potential

---

[1] It is unclear from the record whether Ward sent Berlin an erroneous version of the statute. But regardless, it is clear that Ward never checked Berlin's advice against the correct version of the statute.

removal from the United States when informing Swaby of the many collateral consequences Swaby may endure because he pleaded to a felony charge. J.A. 60-61.

Ward emphasized to the court that he consulted with Berlin about the plea agreement's immigration consequences, and that "the factors in the plea were arrived [at]" based on those discussions. J.A. 64-65. While neither Ward nor the district court could guarantee Swaby's immigration consequences, the district court warned Swaby of merely the "risk" of deportation. J.A. 66. Neither Ward nor the district court informed Swaby that he was pleading to a crime that rendered him automatically deportable.

Swaby pleaded guilty and was sentenced to 364 days of incarceration, $14,220 in restitution payment, and three years of supervised release. But soon after Swaby was released from prison, the Department of Homeland Security lodged an immigration detainer against him and planned to deport him because he had pleaded to an aggravated felony.

B.

While detained, Swaby filed a petition for a writ of *coram nobis* on March 20, 2015. He alleged that he received ineffective assistance of counsel during his criminal proceedings, in violation of the Sixth Amendment. The district court found that Ward's reliance on an inapplicable version of the statute and reassurance that pleading guilty to § 2320(a)(1) would reduce Swaby's risk of deportation was clearly wrong. J.A. 121. And Ward's error constituted deficient performance. But the district court found that Ward's deficient performance did not prejudice Swaby's proceedings because the court warned Swaby that his guilty plea could lead to his deportation, and thus remedied any

6

misunderstanding that might have resulted from Ward's deficient performance. J.A. 123-24. As a result, the district court denied Swaby's *coram nobis* petition.

Swaby next filed a § 2255 habeas petition on September 9, 2015, alleging the same constitutional violation. *See* J.A. 127. The district court treated this petition like a second *coram nobis* petition because, although Swaby was still detained for immigration purposes, Swaby was no longer incarcerated and therefore no longer "in custody." J.A. 134 & n.2. For the same reasons as explained in the *coram nobis* petition, the district court denied habeas relief. Swaby filed a timely notice of appeal from this denial.

## II.

On appeal, the government argues that we lack jurisdiction over Swaby's claim. According to the government, Swaby's *coram nobis* petition should have been treated like a § 2255 habeas petition because he was in custody at the time of filing. As a result, the government believes that we lack jurisdiction over Swaby's titled § 2255 habeas petition because it is an improper successive petition, and that we lack jurisdiction over Swaby's first petition because Swaby has not requested a certificate of appealability.

A writ of *coram nobis* is an exceptional remedy that may be granted only when a fundamental error has occurred and no other available remedy exists. *United States v. Mandel*, 862 F.2d 1067, 1075 (4th Cir. 1988). Here, habeas was in fact available to Swaby. As a result, Swaby could seek relief only through a habeas petition, and not through a *coram nobis* petition.

7

The parties dispute whether habeas was available to Swaby, because the case law is unclear if an individual under supervised release is still "in custody" after deportation. But an applicant need only be "'in custody' when the application for habeas corpus is filed."[2]  *Carafas v. LaVallee*, 391 U.S. 234 (1968).  And "[a] prisoner on supervised release is considered to be 'in custody' for the purposes of a § 2255 motion."  *United States v. Pregent*, 190 F.3d 279, 283 (4th Cir. 1999).  Here, Swaby was in the United States, under supervised release and detained by immigration authorities, when he filed both of his petitions.  Thus, he was in custody, and habeas was available to Swaby when he filed his *coram nobis* petition.  As a result, we view Swaby's first petition as an invalid *coram nobis* petition, and his titled habeas petition as a valid habeas petition for which Swaby has filed a notice of appeal.[3]

Swaby correctly notes that we are authorized to treat his timely notice of appeal as a request for a certificate of appealability.  A certificate of appealability may only be issued when the applicant "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  When a district court has rejected the

---

[2] When an inmate is released from custody, a habeas petition may become moot. But here, the collateral immigration consequences Swaby continues to suffer from because of his federal felony conviction ensure his case is not moot.  *See Carafas v. LaVallee*, 391 U.S. 234, 237-38 (1968).

[3] Like the district court was, we may treat Swaby's *coram nobis* petition like a habeas petition.  *See, e.g.*, *Castro v. United States*, 540 U.S. 375, 381 (2003) (noting that federal courts are free to recharacterize a litigant's postconviction motion to avoid unnecessary dismissal, avoid inappropriately stringent application of formal labeling requirements, or better express the motion's legal basis).  But we do not have to, especially here where Swaby has filed, received a final judgment on, and timely appealed a habeas petition on the same issue.

applicant's constitutional claim on the merits, an appellate court may issue a certificate of appealability if the applicant "demonstrate[s] that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S 473, 484 (2000). For the reasons below, we find that reasonable jurists would find the district court's decision on Swaby's Sixth Amendment claim debatable or wrong. As a result, we issue a certificate of appealability, and therefore have jurisdiction over Swaby's petition.

III.

We next turn to the merits of Swaby's Sixth Amendment claim. We review a district court's denial of habeas relief de novo.[4] *Teleguz v. Pearson*, 689 F.3d 322, 327 (4th Cir. 2012).

To prevail on an ineffective assistance of counsel claim under the Sixth Amendment, Swaby must show both that (1) his counsel was professionally unreasonable and (2) his counsel's deficient performance prejudiced Swaby's defense. *Strickland v.*

---

[4] The district court treated Swaby's habeas petition like a second *coram nobis* petition and adopted much of the district court's analysis in Swaby's original *coram nobis* petition. Yet the district court's *coram nobis* analysis is identical to an analysis used for habeas petitions. *Cf. Blanton v. United States*, 94 F.3d 227, 235 (6th Cir. 1996) ("Because of the similarities between *coram nobis* proceedings and § 2255 proceedings, the § 2255 procedure often is applied by analogy in coram nobis cases."). The district court received a habeas petition, reviewed the petition like a habeas petition, and denied the petition. Therefore, we view the district court's disposition as a dismissal of a habeas petition on the merits.

9

*Washington*, 466 U.S. 668, 691-92 (1984). These are often called the "deficient performance" and "prejudice" prongs of a *Strickland* inquiry.

A.

We first turn to the deficient performance prong. Counsel's failure to advise a client about "succinct, clear, and explicit" immigration consequences for a conviction is constitutionally deficient performance under the Sixth Amendment. *Padilla v. Kentucky*, 559 U.S. 356 (2010). In *Padilla v. Kentucky*, Padilla's counsel did not inform Padilla that he was pleading to an aggravated felony that rendered him categorically deportable. *Id.* at 368-69. And while immigration consequences can be complex, Padilla's counsel could have determined that Padilla's crime was an aggravated felony "simply from reading the text of the statute." *Id.* at 368. His failure to do so, and his "false assurance" that the conviction would not result in Padilla's removal from the country, easily constituted deficient performance.

Swaby's circumstances here are identical to Padilla's, and similarly demonstrate deficient performance. Like Padilla's counsel, Ward failed to inform Swaby that, under the plea agreement, Swaby would be pleading to an aggravated felony that would render him categorically deportable. Like the error in *Padilla*, Ward only needed to read the correct version of the statute to determine that the crime was an aggravated felony. And like the false assurances Padilla's counsel made, Ward structured the plea agreement to avoid an aggravated felony and advised Swaby that the plea agreement presented only a risk, but not a certainty, of deportation.

10

Effective representation by counsel requires that counsel provide correct advice when the deportation consequences are clear. *See id.* at 369. Ward's error--in providing Berlin with the incorrect statute, failing to read the statute to verify Berlin's advice, or both--constitutes deficient performance under the Sixth Amendment.

B.

Swaby must also show that Ward's deficient performance prejudiced Swaby's defense. But a defendant cannot show prejudice if the district court corrects the misadvice and the defendant understands the correction. *United States v. Akinsade*, 686 F.3d 248, 253 (4th Cir. 2012). Here, the parties dispute whether the district court's general warnings cured Ward's deficient performance. We hold that the court's warnings, which were general and referenced only a vague "risk" or possibility of deportation, do not.

In *United States v. Akinsade*, this Court found that the district court's general warnings of a risk of deportation did not correct the counsel's deficient performance. There, Akinsade pleaded guilty to one count of embezzlement after relying on his counsel's erroneous advice that the offense would not render him deportable. *Id.* at 250. At the plea colloquy, the district court reviewed the potential collateral consequences to Akinsade if he pleaded guilty to a felony, including the risk that he "could be deported." *Id.* This Court recognized that a "careful explanation" specifically correcting the misadvice may cure any prejudice the misadvice might have caused. *Id.* at 253-54. But a "general and equivocal admonishment" about merely the risk of deportation is insufficient to cure counsel's erroneous advice that the defendant's crime would not

11

render him categorically deportable. *Id.* at 254. And in *Akinsade*, the district court's vague warning about only a risk of deportation failed to inform Akinsade that he faced likely mandatory deportation by pleading to an aggravated felony. *Id.* Thus, the court's general and equivocal instruction did not cure counsel's deficient performance because Akinsade could not have known at the plea colloquy that his plea was for an aggravated felony that led to categorical deportation.

Swaby's case is identical to Akinsade's. Like in *Akinsade*, Swaby only received general and equivocal admonishments about a risk of deportation. Neither Ward nor the district court informed Swaby that he was pleading to an aggravated felony rendering him categorically deportable. The court's general, nonspecific warning that Swaby may face immigration consequences and may be deported could not cure Ward's deficient performance.

### C.

Having established that Swaby satisfies the deficient performance prong and that the district court's warning did not cure the deficient performance, we next turn to the prejudice prong of the *Strickland* inquiry. A defendant satisfies this prong by showing that his counsel's deficient performance prejudiced his defense by "affect[ing] the outcome of the plea process." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). A defendant is prejudiced if "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* Our sister circuits have also, we believe correctly, recognized that a defendant is prejudiced if there is a reasonable probability that the defendant could have negotiated a plea agreement that did

12

not affect his immigration status. *United States v. Rodriguez-Vega*, 797 F.3d 781, 788-89 (9th Cir. 2015); *Kovacs v. United States*, 744 F.3d 44, 52-53 (2d Cir. 2014). We first conclude that Swaby has shown a reasonable probability that he could have negotiated a plea agreement that avoided immigration consequences. We next conclude that Swaby has shown a reasonable probability that he would have gone to trial rather than accept the plea agreement if he were aware of the agreement's immigration consequences. As a result, Swaby satisfies the prejudice prong of the *Strickland* analysis.

1.

We first examine whether Swaby has demonstrated a reasonable likelihood that he could have negotiated a plea agreement that avoided immigration consequences. The Second and Ninth Circuits have adopted the same metric by which to make this assessment, and we adopt this standard.

In *Kovacs v. United States*, the Second Circuit reviewed an immigrant's *coram nobis* petition seeking vacatur of his guilty plea because his attorney erroneously informed him that the crime to which he pleaded guilty was not a deportable offense. 744 F.3d 44, 49-50 (2d Cir. 2014). After concluding that Kovacs satisfied the deficient performance prong, the court turned to the prejudice inquiry. The court held that a defendant was prejudiced if, "but for counsel's unprofessional errors, there was a reasonable probability that the petitioner could have negotiated a plea that did not impact immigration status." *Id.* at 52. To make this showing, Kovacs had to demonstrate both his resolute intent to structure a plea agreement that avoided immigration consequences, and a reasonable probability "that the prosecution would have accepted, and the court

13

would have approved, a deal that had no adverse effect on [Kovacs's] immigration status." *Id.*

The Second Circuit found that Kovacs made this showing. It was apparent that Kovacs had a "single-minded focus" in the plea negotiations on avoiding immigration consequences. His attorney and the government also settled on the criminal charge during plea negotiations "for the sole reason that [the attorney] believed it would not impair Kovacs' immigration status." *Id.* at 53. These facts demonstrated a reasonable probability that the prosecution and the court would have accepted a different plea agreement that would not render Kovacs deportable. *Id.*

In *United States v. Rodriguez-Vega*, the Ninth Circuit adopted the Second Circuit's reasoning. It initially determined that a defendant could show a reasonable probability of negotiating a better plea agreement by identifying cases where the government allowed a defendant who committed a similar crime to plead to a lesser, non-deportable offense. 797 F.3d at 788. But it further stated that "[a] petitioner may also demonstrate a reasonable probability [of negotiating a better plea] by showing that she settled on a charge in a purposeful attempt to avoid an adverse effect on her immigration status." *Id.* at 789. Citing *Kovacs*, the Ninth Circuit found that Rodriguez-Vega made this showing: Rodriguez-Vega rejected an initial plea bargain, and then accepted a later bargain only after a particular removal provision was deleted and she had been advised that she was less likely to be deported for a misdemeanor than a felony. *Id.*

Here, Swaby's negotiations displayed a similarly single-minded focus and similar acquiescence by the government. As a result, Swaby has demonstrated a reasonable

14

likelihood that he would have negotiated for, and the government would have been amenable to, a plea agreement that had no immigration consequences. Like the counsel in *Kovacs* and *Rodriguez-Vela*, Ward was aware of Swaby's immigration concerns from the outset of the case and structured the plea agreement with the sole purpose of avoiding immigration consequences. J.A. 149-51. After receiving advice from Berlin, Ward requested several changes aimed at avoiding Swaby's immigration consequences, including pleading to a different charge, reducing the sentence to 364 days, and incorporating edits that removed fraud and deception language from the stipulation of facts. And the government accepted all of Ward's requests, except for Ward's request to reduce Swaby's crime to "aiding and abetting." J.A. 164. Swaby's single-minded focus in structuring the plea agreement to avoid immigration consequences, and the government's acquiescence to Ward's many modifications, demonstrate that Swaby had a reasonable likelihood of successfully negotiating a plea agreement that avoided categorical deportation.

Ward asserts that the government would not have acquiesced to a plea agreement with under $10,000 in losses because he had asked the prosecution "in further conversations" to reduce the loss amount below $10,000 and was rejected. J.A. 151. But none of his plea negotiations in the record indicate that he raised the issue. J.A. 158-64. And because Ward believed the plea agreement lacked language about fraud or deceit, Ward could not have been on notice that the loss amount rendered Swaby's crime an aggravated felony. Given the government's flexibility in Ward's other, similarly aimed requests, it is reasonably likely that the government may have agreed to a loss amount

15

below $10,000 in exchange for other concessions had Ward known the full importance of the loss amount. This is especially true when even the government's initial communications stated that the plea agreement would seek a loss amount between $10,000 and $30,000, and the ultimate plea agreement resulted in only $14,220 in restitution.

For these reasons, Swaby has demonstrated a reasonable likelihood that, but for his counsel's erroneous advice, he could have negotiated a different plea agreement. As a result, Ward's deficient performance prejudiced Swaby's defense.

2.

Swaby alternatively can demonstrate prejudice by showing a reasonable likelihood that, absent his counsel's error, he would have gone to trial instead. To determine Swaby's reasonable likelihood of going to trial, we must look to the strength of the state's case "inasmuch as a reasonable defendant would surely take it into account." *Ostrander v. Green*, 46 F.3d 347, 356 (4th Cir. 1995), *overruled on other grounds by O'Dell v. Netherland*, 95 F.3d 1214 (4th Cir. 1996). But likelihood of acquittal at trial is not the only factor a defendant considers, especially when the offered plea carries considerable collateral consequences. For example, this Court has found prejudice when the defendant "had significant familial ties to the United States and thus would reasonably risk going to trial instead of pleading guilty and facing certain deportation." *Akinsade*, 686 F.3d at 255. And a defendant facing deportation may go to trial for a crime involving fraud or deceit, despite overwhelming evidence of guilt, in order to assert that the crime's estimated loss was less than $10,000. *See id.* at 255-56.

16

In *Akinsade*, Akinsade's guilty plea to one count of embezzlement by a bank employee of $16,400 was an aggravated felony because it was a crime involving fraud or deceit with a loss amount of more than $10,000. Had he known about the consequences of his guilty plea, Akinsade and his attorney assert that Akinsade would have gone to trial to dispute the alleged loss amount, and to argue that the loss amount attributable to his crime was less than $10,000. Such a choice "is rational," and this Court noted that it "cannot conclude that a reasonable defendant in Akinsade's shoes" would have acted differently. *Id.* at 256.

Swaby's case is indistinguishable. Similar to Akinsade, Swaby alleges in a sworn affidavit submitted with his *coram nobis* petition that he would have gone to trial rather than plead guilty in order to avoid deportation. He specifically alleges that he would have contested the loss amount, J.A. 101, which he asserts were rough estimates made during plea negotiations and based on overly inflated values of brand marks unattached to merchandise. And even more than Akinsade, Swaby has long familial ties to the United States, including a wife and children. It is rational that a person in his situation, with such strong connections to this country, would rather risk a trial to reduce the loss amount than plead guilty and accept the certainty of deportation.

The government asserts that no reasonable person in Swaby's position would have gone to trial because, based on the government's evidence, Swaby likely would have

17

been convicted and found guilty of a loss amount greater than $10,000.[5] But the prejudice prong does not require a defendant to show that going to trial would have been the best objective strategy or even an attractive option. It merely requires the defendant to show a reasonable likelihood that a person in the defendant's shoes would have chosen to go to trial. The decision does not need to be optimal and does not need to ensure acquittal; it only needs to be rational.

Here, Swaby is a husband, a father, and had been a resident of the United States since 2001. It is not only reasonably likely, it is unsurprising that Swaby, had he known the true consequences of his guilty plea, would have taken any chance, *no matter how slim*, to avoid deportation by going to trial than accept mandatory deportation from his family and resident country. And here, Swaby's likelihood of success was not minimal. *See, e.g.*, *Lee v. United States*, 825 F.3d 311, 313-14 (6th Cir. 2016) (describing, in examining *Strickland*'s prejudice prong, circuit split on whether immigrant-defendant's desire to throw a "Hail Mary," like a hope for jury nullification, at trial in hopes of

---

[5] The government asserts that Swaby had no chance of reducing the loss amount below $10,000 at trial. In addition to defending its estimates, including an estimate of $8,804 by Coach for the number of counterfeit items seized, the government asserts that a single counterfeit mark has the value of an authentic product. Thus, the 2,000 recovered counterfeit marks must value more than $10,000. Appellee Br. 28 (citing J.A. 106). But it is unclear how counterfeit marks, unattached to any merchandise and therefore lacking any authentic comparator, can be assessed for lost value. *Cf., e.g.*, *United States v. Cone*, 714 F.3d 197 (4th Cir. 2013) (mentioning unattached brand marks but determining only whether particular products were counterfeit); *United States v. Habegger*, 370 F.3d 441 (4th Cir. 2004) (mentioning unattached brand marks but only discussing counterfeit charges for counterfeit socks and T-shirts); *Chanel, Inc. v. Banks*, No. WDQ-09-845, 2011 WL 121700 (D. Md. Jan. 13, 2011) (unreported) (calculating, in civil suit, statutory damages based on each counterfeit mark per type of goods sold).

avoiding deportation is a rational decision that amounts to prejudice), *cert. granted*, 137 S. Ct. 614 (Dec. 14, 2016).[6]  Therefore, Ward's deficient performance prejudiced Swaby's defense because there was a reasonable likelihood he would have gone to trial.


IV.

For these reasons, Swaby's Sixth Amendment right to effective counsel was violated during his criminal proceedings.  We reverse the district court's denial of habeas relief, vacate Swaby's conviction, and remand for further proceedings consistent with this opinion.


*REVERSED, VACATED, AND REMANDED*

---

[6] The Sixth Circuit characterizes this Court's *Akinsade* decision as one holding that a "Hail Mary" thrown at trial is not rational.  But we have never so held.