No. 16-1069 - <u>State of West Virginia v. Orville M. Hutton</u>

**FILED**
**November 1, 2017**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

LOUGHRY, Chief Justice, dissenting:

In *State v. Hutton*, 235 W.Va. 724, 776 S.E.2d 621 (2015) ("*Hutton I*"), I concurred in the majority's historical analysis of the common law writ of error coram nobis, as well as its ultimate conclusion that the writ remains available only in extraordinary circumstances in criminal proceedings in West Virginia. I also concurred in the majority's new syllabus point four to the extent it reflected the holding of the United States Supreme Court in *Padilla v. Kentucky*, 559 U.S. 356 (2010).[1] However, I strongly disagreed with the majority's implication that *Padilla* imposes a duty on lawyers to explore the immigration status of all criminal defense clients,[2] and I expressed my opinion that *Padilla* has no

---

[1]*See Hutton I*, 235 W.Va. at 725, 776 S.E.2d at 623, syl. pt. 4 ("Under *Padilla v. Kentucky*, 559 U.S. 356, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010), the Sixth Amendment requires defense counsel to warn an immigrant client of the deportation consequences of a guilty plea. When the deportation consequence is succinct, clear, and explicit under the applicable law, counsel must provide correct advice to the client. When the law is not succinct or straightforward, counsel is required only to advise the client that the criminal charges may carry a risk of adverse immigration consequences.").

[2]As I explained in my separate opinion in *Hutton I*,

> In footnote eighteen, the majority excuses Mr. Hutton's admitted failure to advise his counsel of his immigration status by stating that the *Padilla* Court did not place a burden on criminal defendants to advise their lawyers of their immigration status. While that statement may be correct, I am concerned that the inverse implication of footnote eighteen is that the burden is on lawyers to explore the immigration status of every criminal

(continued...)

1

application under the facts and circumstances of the case at bar. In the instant appeal, Orville

Hutton[3] returns to this Court, seeking relief from the circuit court's order denying relief in

coram nobis, which was entered on remand from *Hutton I*. Because the majority erroneously

reverses the circuit court's decision, I am compelled to dissent.

On remand, the circuit court held an evidentiary hearing to determine whether

Mr. Hutton was entitled to relief in coram nobis from his conviction based on his claim of

ineffective assistance of counsel, Thomas Dyer. In addressing that question, the circuit court

was guided by syllabus point five of *Hutton I* wherein this Court held that

> [a] claim of legal error may be brought in a petition for
> a writ of error coram nobis only in extraordinary circumstances

---

[2](...continued)

> defense client, notwithstanding the fact that *Padilla* did not
> expressly impose such a duty. Because the focus of *Padilla* was
> on the importance of a lawyer giving his or her client accurate
> advice regarding the immigration consequences of a guilty plea,
> the Court simply never addressed precisely how immigration
> status was to be discerned. *See* [*State v.*] *Stephens*, 265 P.3d
> [574,] at 577 ("The only issue the United States Supreme Court
> decided was whether defense counsel had a duty to inform his
> client, known to be a resident alien, of the effect of a guilty plea
> on the client's immigration status.").

*Hutton I*, 235 W.Va. at 744-45, 776 S.E.2d at 641-42 (Loughry, J., concurring, in part, and dissenting, in part).

[3]"Mr. Hutton was born in Jamaica in 1962. He came to the United States in 1971, at the age of nine. Mr. Hutton has resided in this country since that time. He is classified as a permanent resident of this country, but he is not an American citizen." *Hutton I*, 235 W.Va. at 726, 776 S.E.2d at 623.

and if the petitioner shows that (1) a more usual remedy is not available; (2) valid reasons exist for not attacking the conviction earlier; (3) there exists a substantial adverse consequence from the conviction; and (4) the error presents a denial of a fundamental constitutional right.

235 W.Va. at 726, 776 S.E.2d at 623. This four-part test was taken from the test set forth in *United States v. Akinsade*, 686 F.3d 248 (4th Cir. 2012), which this Court found "provide[d] a good framework for limiting the use of the writ of error coram nobis to assert a constitutional legal error." Following its consideration of the evidence presented at the hearing below, the circuit court entered an order on October 18, 2016, finding that Mr. Hutton failed to meet three of the four factors set forth above.[4]

Regarding the first factor, the circuit court found that Mr. Hutton has a more usual remedy through his federal appeal that is pending in the Third Circuit Court of Appeals. And, because that appeal involves a split among the federal circuit courts, the circuit court further observed that Mr. Hutton could pursue a petition for certiorari to the

---

[4]Regarding the third factor, the circuit court stated in order, as follows:

> Adverse consequences may presently exist for Petitioner/Defendant as a result of his deportation (removal) proceedings, regardless of being deemed either direct or collateral. However, such further developed evidentiary record herein . . . does not establish the threshold requirement of his having been denied a fundamental constitutional right established pursuant to *Padilla*.

United States Supreme Court. The majority does not address this factor and, instead, finds that the State had "indirectly conceded the issue" when it stated that "[t]o the extent Mr. Hutton seeks to have his conviction vacated and not merely to avoid the deportation consequences of his conviction, his federal appeal does not provide a more usual remedy." The majority ignores the State's further argument that "a remedy remains available so long as jurisdiction would be proper in some other court even if relief is foreclosed."[5] In other words, even if Mr. Hutton cannot collaterally attack his state conviction through his deportation appeal pending in federal court, he is pursuing the relief that he seeks in the instant matter–avoiding deportation–through a more usual remedy in the federal court, and his likelihood of success in his federal case is irrelevant to whether that avenue is "an available more usual remedy."[6]

---

[5]In support of its argument, the State cites *United States v. Payne*, 644 F.3d 1111 (l0th Cir. 2011), wherein the court denied the defendant's request for a writ of error coram nobis, finding "[i]t [was] irrelevant that a § 2255 motion would have been untimely by the time he filed his petition for a writ of *coram nobis*." *Id.* at 1113. The State also relies upon *Matus-Leva v. United States*, 287 F.3d 758 (9th Cir. 2002), in which the court found that a writ of error coram nobis requires that other remedies be unavailable, stating that "Matus-Leva's argument that a § 2255 petition is not really available to him because it is time barred under the Antiterrorism and Effective Death Penalty Act, is unavailing. A petitioner may not resort to *coram nobis* merely because he has failed to meet the AEDPA's gatekeeping requirements." *Id.* at 761 (footnote omitted).

[6]The circuit court recounted in its order testimony given by Mr. Hutton's immigration expert during the evidentiary hearing below: "[G]enerally . . . the basic law suggests . . . that if you are convicted of an aggravated felony you are, as a matter of law, deportable[,]" but that "as with all immigration cases, the government has a great deal of discretion as to enforcement, and usually the cases . . . of undue hardship to family, extenuating circumstances, time in the country, time since the crime was committed, etc., etc., which the

(continued...)

4

In addressing the second factor, the circuit court concluded that Mr. Hutton had not demonstrated a valid reason for failing to attack his conviction earlier through a habeas corpus petition, particularly where the evidence showed that his post-conviction counsel advised him of the possibility of filing a habeas petition alleging ineffective assistance of counsel, even if not on the same basis that Mr. Hutton currently asserts. While Mr. Hutton was serving his sentence, he pursued numerous post-conviction challenges.[7] Had he brought an ineffective assistance of counsel claim in a habeas proceeding, as his post-conviction counsel suggested, he might have achieved the relief from his conviction that he currently seeks through a writ of error coram nobis, which is only available in extraordinary circumstances.

Although the majority attempts to qualify, through dicta, the second factor in syllabus point five of *Hutton I*, by restricting it to whether Mr. Hutton's *Padilla* claim was timely, such was not the intent in *Akinsade* upon which this Court based the four-part test for a writ of error coram nobis adopted in *Hutton I*. In *Akinsade*, the defendant pled guilty to

---

[6](...continued)
courts can take into consideration."

[7]In August 2010, Mr. Hutton filed a notice of appeal with the assistance of his post-conviction counsel in which he identified two issues: (1) ineffective assistance of counsel; and (2) any other grounds that may be discovered during the investigation of this case. In a motion for post-conviction bond, Mr. Hutton stated that he might waive his right to appeal and "prosecute a Writ of Habeas Corpus for ineffective assistance of counsel."

5

embezzlement after his attorney incorrectly told him that it was not a deportable offense. *Akinsade*, 686 F.3d at 250. When the defendant later sought relief from his conviction through coram nobis, the Fourth Circuit found that the defendant had no basis to challenge his conviction prior to being detained by immigration authorities because "his attorney's advice, up to that point in time, appeared accurate." *Id.* at 252. In the instant matter, Mr. Hutton's post-conviction counsel had identified a basis for Mr. Hutton to challenge his conviction–ineffective assistance of trial counsel–but it was not pursued. Accordingly, I agree with the circuit court's conclusion that Mr. Hutton failed to meet the second coram nobis factor because he "was aware of his ability to file a Petition for a Writ of Habeas Corpus attacking his conviction for ineffective assistance of counsel during his initial period of incarceration following his sentencing in the underlying criminal matter" and that he had "not demonstrated the existence of any valid reason for having not attacked his underlying conviction earlier upon claims of ineffective assistance of counsel towards Mr. Dyer."

Turning to the fourth coram nobis factor–whether the legal error asserted presents a denial of a fundamental constitutional right–Mr. Hutton alleges an ineffective assistance of counsel claim based on *Padilla*. In West Virginia,

> claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable

6

probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.

Syl. Pt. 5, in part, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995).

In addressing Mr. Dyer's performance with regard to *Padilla*, the circuit court found that Mr. Dyer's testimony was credible and demonstrated that Mr. Hutton was alerted to potential immigration issues dependent upon his actual citizenship status in the conversations he had with Mr. Dyer. The circuit court further found that Mr. Hutton "chose . . . to not directly disclose . . . the exact nature of [his] status" to Mr. Dyer and that his evasive responses caused Mr. Dyer to infer that Mr. Hutton was not an immigrant.[8] This inference was reasonable and certainly not indicative of deficient performance. In fact, under *Strickland*, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions[,]" particularly since counsel's actions "are usually based, quite properly . . . on information supplied by the defendant." 466 U.S. at 691. Further, "what investigation decisions are reasonable depends critically on such information." *Id.* Moreover, the circuit court found that Mr. Hutton's contrary testimony was not credible. *See Anderson v. City of Bessemer*, 470 U.S. 564, 575 (1985) (finding that

---

[8]The majority disagrees with the circuit court and finds, instead, that Mr. Dyer's testimony was vague and inconsistent. However, what is clear from Mr. Dyer's testimony is that he did not have any conversations with Mr. Hutton about the immigration consequences of pleading guilty because when he asked Mr. Hutton whether this was an issue we should be concerned with, Mr. Hutton responded, "no, don't worry about it."

7

credibility determinations are due deference because "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said."). As the circuit court aptly observed,

> [a]ny constitutional right infirmity alleged for post-conviction extraordinary relief cannot be prefaced upon Petitioner/Defendant's selective memory, his voluntary failure to adequately apprise his legal counsel of pertinent personal information which may significantly impact the resulting legal representation and/or his subjective hindsight upon discovering adverse consequences to his criminal conviction and resulting incarceration.

In evaluating Mr. Hutton's ineffective assistance of counsel claim, "[j]udicial scrutiny of counsel's performance must be highly deferential[.]" *Strickland*, 466 U.S. at 689. Although the circuit court found that Mr. Hutton had not demonstrated that his counsel was ineffective, rather than applying deference to that conclusion, the majority "summarily" disposes of the first prong of *Strickland*, finding that Mr. Dyer's performance was deficient because "*Padilla* required defense counsel to inform Mr. Hutton that, if he was an immigrant, his guilty plea would subject him to deportation."[9] Of course, one could read this statement

---

[9]The cases relied upon by the majority for this conclusion are factually distinguishable. For example, in *United States v. Swaby*, 855 F.3d 233 (4th Cir. 2017), counsel "immediately recognized that 'immigration status would be a significant consideration' for Swaby, who had a green card and intended to apply for U.S. citizenship" and that "from the beginning of the representation, Swaby '[wa]s concerned and ha[d] always been concerned about his immigration status.'" *Id.* at 236. Similarly, in *State v. Favela*, 343 P.3d 178 (N.M. 2015), counsel was aware prior to the plea hearing that his client was not a United States citizen. Unlike these cases, Mr. Dyer testified below that when he asked Mr.

(continued...)

8

as somehow imposing a broad duty upon counsel to investigate the immigration status of criminal clients. If that is the majority's intent, I strongly disagree.

First, as I explained in my separate opinion in *Hutton I*, *Padilla* does not provide Mr. Hutton the relief that he seeks. I observed that

> [t]he sole similarity between Mr. Hutton in the instant matter, and the petitioner in *Padilla*, Jose Padilla, is that both were longtime, lawful permanent residents of this country, but not American citizens, when they became subject to deportation as a direct consequence of their guilty pleas to criminal charges. What remains are two factually significant differences that render *Padilla* inapplicable to Mr. Hutton's situation.

*Hutton I*, 235 W.Va. at 743, 776 S.E.2d at 640 (Loughry, J., concurring, in part, and dissenting, in part). In *Padilla*, Mr. Padilla told his counsel that he was not a United States citizen and asked counsel whether a guilty plea would have adverse immigration consequences. After being assured by his counsel that he "'did not have to worry about immigration status since he had been in the country so long[,]'" Mr. Padilla pled guilty. *Padilla*, 559 U.S. at 359 (internal citation omitted). That legal advice was incorrect because Mr. Padilla's conviction made "deportation virtually mandatory." *Id.* Contrasting those facts with the instant matter, during Mr. Hutton's first coram nobis hearing, he testified that he never told his counsel of his immigration status, a fact that was confirmed by Mr. Dyer's

---

[9](...continued)
Hutton whether this was an issue that they should be concerned about, Mr. Hutton told him, "no, don't worry about it."

9

testimony during the evidentiary hearing held on remand. Moreover, unlike Mr. Padilla, Mr.

Hutton does not assert that his trial counsel gave him incorrect immigration advice. To the

contrary, the evidence presented during the evidentiary hearing below demonstrates that

rather than advising his counsel of his immigration status and/or expressing concern

regarding what his guilty plea would mean for him immigration-wise, Mr. Hutton was

evasive, assuring counsel that it was nothing to worry about.

Second, it is "clear from *Padilla* that the Supreme Court did not expressly

impose a blanket duty upon lawyers to ask every client charged with a crime whether they

are American citizens." *Hutton I*, 235 W.Va. at 744, 776 S.E.2d at 641. Further,

> [t]he Supreme Court's silence in this regard has been recognized
> by other courts. For example, in *Clarke v. State*, 974 N.E.2d
> 562 (Ind. Ct. App. 2012), the court commented on the issue of
> whether criminal defense lawyers must "ascertain the citizenship
> of their clients[,]" observing that "this issue is percolating in
> other states[.]" *Id.* at 568. The Indiana court then cited *State v.
> Stephens*, 46 Kan.App.2d 853, 265 P.3d 574, 577 (2011), review
> denied, wherein the Kansas court stated that "[t]he *Padilla* Court
> did not . . . impose upon counsel the duty to investigate the
> citizenship or immigration status of every client in a criminal
> case."

*Hutton I*, 235 W.Va. at 744, 776 S.E.2d at 641.[10] In the more recent decision of "*State v.*

*Rodriguez*, No. 108, 505, 320 P.3d 449 (Table) (Kan. App. Mar. 14, 2014) . . . the Kansas

---

[10]Regarding *Padilla*, the *Stephens* court further observed that "[t]he only issue the United States Supreme Court decided was whether defense counsel had a duty to inform his client, known to be a resident alien, of the effect of a guilty plea on the client's immigration status." *Stephens*, 265 P.3d at 577.

court relied upon *Stephens*, again noting that '[t]he *Padilla* majority did not impose a duty to investigate the citizenship or immigration status of every client in a criminal case.'" *Hutton I*, 235 W.Va. at 744, 776 S.E.2d at 641. I agree that if a client informs his or her lawyer that he or she is an immigrant, then *Padilla* imposes a duty on counsel to advise that client of the deportation consequences arising out of a guilty plea. However, because the United States Supreme Court has not imposed a duty on counsel to investigate the citizenship or immigration status of every client in a criminal case, I believe that any effort by the majority to impose such a duty is unfounded.

Regarding the second prong of *Strickland*, Mr. Hutton had to demonstrate that he was prejudiced by his counsel's deficient performance. Not only do I agree with the circuit court's conclusion that Mr. Hutton failed to show that his counsel had performed deficiently, I also agree with the court's conclusion that he could not show prejudice. The seriousness of the charges in the underlying criminal proceeding–one count of malicious assault and three counts of second degree sexual assault–and the strength of the evidence against him[11] made it unreasonable for Mr. Hutton to reject the plea agreement, which

---

[11]The State represents that during Mr. Hutton's plea hearing, the State proffered that "the victim [Mr. Hutton's girlfriend and the mother of his child] was prepared to testify that Hutton had hit her with his fists, choked her until she almost passed out, threw her into a wall, and continued to beat her with his fists and hands[;]" that "nine days after the battery, the victim needed assistance to get out of the house and could not walk on her own[;]" and that "[h]ospital records from nine days after the battery showed multiple contusions to the back, chest, abdomen, shoulders, and sides, and a chest wall contusion." The State further
(continued...)

11

allowed him to plead guilty to one count of unlawful assault (a lessor included offense of malicious assault) with a dismissal of the other charges. Indeed, Mr. Hutton was facing overwhelming evidence, including the testimony of his victim, corroborating witnesses, and his own admissions.

Although the majority states that *Lee v. United States*, 137 S.Ct. 1958, 582 U.S. __ (2017),[12] supports its conclusion that under the facts of this case, Mr. Hutton would not have pled guilty had his counsel advised him that he would be deported if he did so, *Lee* does not help Mr. Hutton's cause. Unlike Mr. Hutton, who was evasive with his counsel concerning his status, Mr. Lee "informed his attorney of his noncitizen status and repeatedly asked him whether he would face deportation as a result of the criminal proceedings." *Id.* at 1963, 582 U.S. at __. In response, Mr. Lee's attorney incorrectly advised him that "he would not be deported as a result of pleading guilty." *Id.*

In addressing Mr. Lee's ineffective assistance of counsel challenge, the Supreme Court noted that the Court of Appeals had recalled the holding in *Hill v. Lockhart*,

---

[11](...continued)
represents that during the hearing on the motion for a protective order arising out of the underlying criminal matter, the victim testified that Mr. Hutton sexually assaulted her while she was recuperating from the injuries she sustained in his physical attack upon her.

[12]*Lee* had not yet issued at the time of the circuit court's decision on remand. Mr. Hutton's counsel apprised this Court of the *Lee* opinion in his notice of additional authority filed under Rule of Appellate Procedure 10(i).

474 U.S. 52 (1985), stating that "when a defendant claims that his counsel's deficient performance deprived him of a trial by causing him to accept a plea, the defendant can show prejudice by demonstrating a 'reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" *Lee,* 137 S.Ct. at 1964, 582 U.S. __. The Supreme Court further reasoned, however, that

> common sense (not to mention our precedent) recognizes that there is more to consider than simply the likelihood of success at trial. The decision whether to plead guilty also involves assessing the respective consequences of a conviction after trial and by plea. *See INS v. St. Cyr*, 533 U.S. 289, 322–323, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). When those consequences are, from the defendant's perspective, similarly dire, even the smallest chance of success at trial may look attractive. For example, a defendant with no realistic defense to a charge carrying a 20-year sentence may nevertheless choose trial, if the prosecution's plea offer is 18 years.

*Lee*, 137 S.Ct. at 1966-67, 582 U.S. __. Regarding Mr. Lee's circumstances, the Supreme Court stated:

> We cannot agree that it would be irrational for a defendant in Lee's position to reject the plea offer in favor of trial. But for his attorney's incompetence, Lee would have known that accepting the plea agreement would *certainly* lead to deportation. Going to trial? *Almost* certainly. If deportation were the "determinative issue" for an individual in plea discussions, as it was for Lee; if that individual had strong connections to this country and no other, as did Lee; and if the consequences of taking a chance at trial were not markedly harsher than pleading, as in this case, that "almost" could make all the difference. Balanced against holding on to some chance of avoiding deportation was a year or two more of prison time. . . . Not everyone in Lee's position would make the choice to

13

> reject the plea. But we cannot say it would be irrational to do
> so.

*Lee*, 137 S.Ct. at 1968-69, 582 U.S. at __.

As the majority observes, similar to Mr. Lee, Mr. Hutton has lived in the United States for the majority of his life and has family members who live here, including his son. Critically, however, unlike Mr. Lee, the prison time to which Mr. Hutton was exposed by pleading guilty, contrasted with his exposure had he gone to trial and been convicted, were not " similarly dire." *Lee*, 137 S.Ct. at 1966-67, 582 U.S. __. In fact, dissimilar to the Supreme Court's hypothetical of going to trial on a charge that carries a 20-year sentence where the prosecution's plea offer was 18 years," here, if convicted on all counts, Mr. Hutton's potential consecutive sentence was thirty-two to eighty-five years in prison,[13] whereas his plea bargain resulted in a one to five-year prison term.[14] Consequently, for Mr. Hutton, "[b]alanced against holding on to some chance of avoiding deportation was [] [*decades*] of prison time." *Id.* at 1969, 582 U.S. at __. Because "the consequences of taking a chance at trial were [] markedly harsher than pleading[,]" a rejection of the plea bargain would have been irrational under the circumstances. *Id.* Accordingly, I would affirm

---

[13]*See* W.Va. Code § 61-8B-4 (2014) (providing for penalty of ten to twenty-five years for second degree sexual assault); W.Va. Code § 61-2-9(a) (2014) (providing for penalty of two to ten years imprisonment for malicious assault).

[14]Mr. Hutton's plea bargain allowed him to plead guilty to unlawful assault. *See* W.Va. Code § 61-2-9(a) (providing for penalty of one to five years imprisonment for unlawful assault).

the circuit court's conclusion that Mr. Hutton failed to demonstrate ineffective assistance of counsel and its decision to deny the writ of error coram nobis.

For these reasons expressed above, I respectfully dissent.