**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

**No. 18-6844**

---

UNITED STATES OF AMERICA,

               Plaintiff – Appellee,

    v.

SERGIO CARRILLO MURILLO,

               Defendant – Appellant.

---

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Anthony John Trenga, District Judge. (1:16-cr-00073-AJT-2)

---

Argued: March 20, 2019                         Decided: June 24, 2019

---

Before MOTZ, KING, and THACKER, Circuit Judges.

---

Reversed and remanded by published opinion. Judge Thacker wrote the opinion, in which Judge Motz joined. Judge King wrote a dissenting opinion.

---

**ARGUED:** Stephen Walter Spurgin, SPURGIN LAW OFFICE, El Paso, Texas, for Appellant. Richard Daniel Cooke, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee. **ON BRIEF:** G. Zachary Terwilliger, United States Attorney, Michelle P. Tonelli, Special Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

---

THACKER, Circuit Judge:

On March 24, 2016, a grand jury indicted Sergio Carrillo Murillo ("Appellant") for conspiracy to distribute and possession with intent to distribute cocaine. Three months later, Appellant pled guilty to conspiracy to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

Following his arrest, and throughout the plea negotiation process, Appellant's purported primary concern was the impact a criminal conviction could have on his status as a lawful permanent resident of the United States. His attorney advised him that, if he pled guilty to the lesser included offense, deportation was a mere possibility that he could fight in immigration court. But Appellant's attorney was wrong: conspiracy to distribute cocaine is an "aggravated felony" under the Immigration and Nationality Act, *see* 8 U.S.C. § 1101(a)(43)(B), and a noncitizen convicted of such a crime is subject to *mandatory* deportation, *see id.* § 1227(a)(2)(A)(iii).

On September 7, 2017, Appellant moved under 28 U.S.C. § 2255 to vacate his conviction on the ground that he received ineffective assistance of counsel in violation of the Sixth Amendment. The district court denied his motion, and Appellant appealed. For the reasons that follow, we reverse the decision of the district court and remand for further proceedings.

I.

In 1995, when Appellant was seven years old, he and his family moved from Mexico to the United States. Appellant has lived in the United States ever since. Today, Appellant is a lawful permanent resident. He no longer has family in Mexico, and he is

2

engaged to be married to an American citizen.  As such, "[s]taying in the United States with [his] family has always been [his] number one priority."  J.A. 65. [1]

Twenty-one years after he came to the United States, Appellant got into some legal trouble.  On February 10, 2016, Appellant traveled with another man from New Mexico to Virginia to sell a kilogram of cocaine.  Unknowingly, the pair sold the drugs to a confidential informant.  The confidential informant recorded the transaction while law enforcement officers observed it.  After the exchange, Appellant was arrested.  On March 24, 2016, a grand jury indicted Appellant on two counts of cocaine-related offenses: (1) conspiracy to distribute in violation of 21 U.S.C. §§ 841(a) and 846; and (2) possession with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Shortly after his arrest, Appellant retained attorney Katherine Martell ("Martell") to represent him.  Given his circumstances, Appellant wanted an attorney with immigration law experience, and he had heard Martell touting her knowledge of immigration law on Spanish radio. [2]

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.  Citations to "Supp. J.A. Vol. I" refer to the first volume of the Supplemental Joint Appendix also filed by the parties in this appeal.

[2] Martell hosts a live radio show called Tu Abogada Latina, which translates to Your Latina Lawyer.  *See* First Point Law Group, http://firstpointlawva.com/katherine-martell/ (last visited Apr. 15, 2019).  On the show, Martell discusses "a wide range of legal issues facing the Latino Community."  *Id.*  On the show's Facebook page, Martell advises listeners -- in Spanish -- not to trust immigration advice from friends or neighbors.  *See Tu Abogada Latina*, Facebook (Apr. 11, 2019), https://www.facebook.com/Tuabogadalatina/ posts/muy-buenas-tardes-con-todos-felicidades-a-la-cumplea%C3%B1era-el-dia-de-hoy-la-doctor/528742127290372/. (Continued)

3

On Appellant's behalf, Martell negotiated a plea agreement with the Government. The Government offered to drop the possession with intent to distribute charge if Appellant would plead guilty to the conspiracy charge. That deal allowed Appellant to avoid a mandatory minimum sentence of five years. *See* 21 U.S.C. § 841(b)(1)(B)(ii). After discussing a draft of the plea agreement with Appellant, Martell noted in the margin of the draft, "Ask to omit immigration waivers." J.A. 109. Specifically, Martell sought to omit five immigration-related clauses from the draft:

- (1) "Consent Given for Removal from the United States" (which would have required Appellant not to contest removal proceedings brought against him);

- (2) "Waiver of Rights Related to Removal from the United States" (which would have required Appellant to waive his rights to apply for all forms of relief or protection from removal or deportation);

- (3) "Exception for Changed Circumstances Arising After Plea" (which would have allowed Appellant to apply for asylum, withholding of removal, or protection under Article 3 of the Convention Against Torture based *only* on circumstances arising after the entry of his plea);

- (4) "Abandonment of Pending Applications for Relief from Removal" (which would have required Appellant to abandon any existing immigration benefit he holds or any pending application for relief from removal or deportation); and

- (5) "The Defendant's Cooperation in the Defendant's Removal" (which would have required Appellant to agree to

---

Instead, Martell invites followers to her office for a "totally free and private consultation." *Id.*

4

assist the Department of Homeland Security in any future removal proceedings). *Id.* at 108–10.

Indeed, Martell successfully negotiated with the Government to omit from the final plea agreement those five clauses and one more: "Plea Agreement Binding for Purposes of Removal Proceedings" (requiring Appellant to acknowledge that his waiver of immigration-related rights is binding in any future removal proceedings). *Compare id.* at 108–110 (draft plea agreement), *with* Supp. J.A. Vol. I at 1–13 (final plea agreement).

However, although it did not include an explicit waiver of rights related to removal from the United States, the final plea agreement did mention potential immigration consequences. Specifically, the plea agreement acknowledged that deportation was a *possibility* and provided that Appellant wanted to plead guilty regardless:

> [Appellant] recognizes that pleading guilty may have consequences with respect to [Appellant's] immigration status if [Appellant] is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offenses to which [Appellant] is pleading guilty. Because removal and other immigration consequences are the subjects of a separate proceeding, [Appellant] understands that no one, including [Appellant's] attorney or the District Court, can predict to a certainty the effect of [Appellant's] conviction on [Appellant's] immigration status. [Appellant] nevertheless affirms that [Appellant] wants to plead guilty regardless of any immigration consequences that [Appellant's] plea may entail, even if the consequence is [Appellant's] automatic removal from the United States.

Supp. J.A. Vol. I at 10–11. Crucially, throughout her discussions with Appellant regarding the plea agreement, Martell assured Appellant that he would be able to fight deportation in immigration court.

On June 21, 2016, Appellant pled guilty to the conspiracy charge. At Appellant's plea hearing, both Martell and the district court characterized the likelihood of deportation flowing from Appellant's plea as a *possibility*: First, after Martell informed the district court that Appellant was a lawful permanent resident, the district court asked, "Possibility of deportation then?" Martell responded, "Possibility." J.A. 16. Second, the district court informed Appellant that he "*may be* deported" as a result of his plea. *Id.* at 21 (emphasis supplied). Appellant then confirmed that he understood that he "*may* be deported" as a result of his plea. *Id.* (emphasis supplied). He also acknowledged that he reviewed and understood his plea agreement.

After finding that Murillo was competent to enter his plea and that his plea was knowing, voluntary, and supported by facts, the district court accepted it. Appellant then pled guilty to an "aggravated felony" under the Immigration and Nationality Act. *See* 8 U.S.C. § 1101(a)(43)(B) (defining "aggravated felony" as "illicit trafficking in a controlled substance (as defined in section 802 of Title 21), including a drug trafficking crime (as defined in section 924(c) of Title 18)"). Any noncitizen -- including a lawful permanent resident -- who pleads guilty to an "aggravated felony" is subject to mandatory deportation. *See id.* § 1227(a)(2)(A)(iii) ("Any alien who is convicted of an aggravated felony at any time after admission is deportable."); *see also Lee v. United*

6

*States*, 137 S. Ct. 1958, 1963 (2017) (noting that a lawful permanent resident who pled guilty to an "aggravated felony" was "subject to mandatory deportation").

Thereafter, on September 8, 2016, the district court sentenced Appellant to 24 months in prison and three years of supervised release. Approximately six months later, while Appellant was incarcerated, he learned from an immigration officer that, upon completion of his sentence, he would be deported.

On September 7, 2017, Appellant filed a motion under 28 U.S.C. § 2255 to vacate his conviction, asserting that his attorney had provided him constitutionally ineffective assistance of counsel. Appellant filed several affidavits in support of his motion. In his affidavit, Appellant stated that at no time did Martell inform him that he would be deported if he pled guilty. To the contrary, in her affidavit, Appellant's fiancée stated that when she asked Martell if Appellant's sentence of 24 months would affect his residency, Martell responded, "[N]o because [Appellant] had been a resident for over twenty years that would help him stay here." J.A. 68. Similarly, Appellant's fiancée's mother stated in her affidavit that Martell asserted, "because [Appellant] had already been here for over twenty years, he would not be deported." *Id.* at 70. Likewise, Appellant's mother stated in her affidavit that, when asked whether Appellant's sentence would affect his residency in the United States, Martell assured her that "it would not." *Id.* at 72.

Notably, in his affidavit, Appellant explained the significance of Martell's advice:

> If I had known that by pleading guilty I would be deported
> from this country, I would have asked for a jury trial and tried
> to win my case even if the chances of winning might be small

7

and I might get more prison time. At least I would have a chance, even if small. I would have also asked Ms. Martell to try to get a different plea bargain that would not get me deported. At least she could try! I had never been in trouble like this before.

J.A. 65.

On April 16, 2018, the district court ordered Martell to file a declaration responding to Appellant's claims. In her declaration, Martell acknowledged that Appellant "wanted to try and fight his immigration case" and that she advised him "that he would have to [do so] in immigration court," and claimed that she advised Appellant to hire an immigration attorney. J.A. 98.[3] Martell also acknowledged that Appellant "expressed his desire to fight his immigration case" but stated that "[Appellant's] focus was reducing prison time" and "there was no plea offer available to [Appellant] that could have avoided immigration consequences." J.A. 98.

On June 26, 2018, without holding an evidentiary hearing, the district court denied Appellant's motion to vacate his conviction. Without addressing Martell's performance,

---

[3] Appellant disputes Martell's claim that she advised him to hire an immigration attorney. In an affidavit responding to Martell's declaration, Appellant's mother averred, "At no time did Ms. Martell say to me or my family that we would need to hire an immigration attorney." J.A. 168. Martell's claim that she advised Appellant to consult and immigration attorney is also curious in light of the way Martell markets her services. Martell hosts a Spanish radio show on which she discusses "legal issues facing the Latino Community." First Point Law Group, http://firstpointlawva.com/katherine-martell/ (last visited Apr. 15, 2019). Through that show, she has "helped hundreds of clients facing legal issues." *Id.* Indeed, Martell invites listeners with immigration issues to come to her office for a free consultation. Tu Abogada Latina, *Tu Abogada Latina*, Facebook (Apr. 11, 2019), https://www.facebook.com/Tuabogadalatina/posts/muy-buenas-tardes-con-todos-felicidades-a-la-cumplea%C3%B1era-el-dia-de-hoy-la-doctor/5 28742127290372/.

the district court concluded that Appellant failed to present "any evidence that it would have been rational under the circumstances to reject the plea offer that did not subject to him a mandatory five-year sentence." J.A. 183. In reaching that conclusion, the district court highlighted that Appellant "could not avoid the mandatory immigration consequences were he convicted of any of the charges brought against him" and that Appellant's plea agreement indicated that Appellant "want[ed] to plead guilty regardless of any immigration consequences." *Id.*

On July 3, 2018, Appellant filed a Rule 59(e) motion for reconsideration. A week later, the district court denied that motion too. In doing so, the district court doubled down on its reasoning:

> Dispositive for the Court . . . is that [Appellant's] contention -- that he would not have ple[d] guilty had he known the immigration consequences -- is fundamentally inconsistent with his acknowledgement in his Plea Agreement that "[Appellant] wants to plead guilty regardless of any immigration consequences that [Appellant]'s plea may entail, even if the consequences is the [Appellant]'s automatic removal from the United States." Because of this acknowledgement, the Court concluded that [Appellant] had failed to establish the prejudice prong of the *Strickland* [*v. Washington*, 466 U.S. 668 (1984)] analysis. To have concluded otherwise would undermine plea negotiations and the finality of convictions because of future events that were foreseen and addressed at the time in a formal plea agreement based on whether a defendant really meant what he had agreed to in order to obtain a negotiated plea.

J.A. 198–99 (citations omitted).

Nevertheless, the district court granted Appellant a certificate of appealability "with respect to the application of *Lee*[, 137 S. Ct. at 1958 (finding a defendant can

9

demonstrate that his plea was caused by ineffective assistance of counsel by showing a reasonable probability that, by for his counsel's errors, he would have gone to trial rather than accepting the plea)] to the facts of this case," including whether certain language in Appellant's plea agreement had "the dispositive effect" the district court attributed to it. Order, *United States v. Murillo*, No. 16-cr-00073 (E.D. Va. Mar. 24, 2016; filed July 11, 2018), ECF No. 102. Appellant noted a timely appeal.

## II.

We review a district court's denial of a 28 U.S.C. § 2255 motion de novo. *See United States v. Luck*, 611 F.3d 183, 186 (4th Cir. 2010). In doing so, we resolve any factual ambiguities in the light most favorable to the movant. *See United States v. Poindexter*, 492 F.3d 263, 267 (4th Cir. 2007).

## III.

The Sixth Amendment guarantees criminal defendants effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 685–86 (1984). And that guarantee extends to the plea-bargaining process. *See Missouri v. Frye*, 566 U.S. 134, 140–44 (2012); *see also Lafler v. Cooper*, 566 U.S. 158, 162 (2012). To demonstrate that he was denied the effective assistance of counsel, Appellant must show that his counsel's performance was deficient and that he was prejudiced as a result. *Strickland*, 466 U.S. at 687.

The district court held Appellant could not demonstrate that he was denied effective assistance of counsel. Without addressing whether Appellant's attorney's performance was deficient, the district court concluded Appellant could not satisfy

10

*Strickland*'s prejudice prong because his plea agreement provided that he "want[ed] to plead guilty *regardless* of any immigration consequences" even if those consequences included "automatic removal from the United States." J.A. 198–99 (emphasis supplied). We hold, however, that a single line from a plea agreement cannot bear the weight the Government would like. When the balance of the evidence is considered here, it is clear Appellant demonstrated a reasonable probability that, had he fully understood the immigration implications of his guilty plea, he would not have pled guilty. Because the district court did not consider whether Appellant's attorney's performance was deficient, we decline to address the issue. Instead, the district court should consider it on remand. In this regard, we are confident our current precedent sheds sufficient light on the appropriate standard. *See United States v. Swaby*, 855 F.3d 233, 240 (4th Cir. 2017) ("Effective representation by counsel requires that counsel provide correct advice when the deportation consequences are clear.").

A.

To demonstrate prejudice, a criminal defendant must prove that there is a reasonable probability that, without his counsel's deficient performance, the result of the proceeding in which the deficiency occurred would have been different. *See Strickland*, 466 U.S. at 694. That requirement applies even when the constitutionally deficient performance affects the outcome of the plea process. *See Hill v. Lockhart*, 474 U.S. 52, 58–59 (1985).

But in the context of a plea bargain, the defendant is the master of the outcome. And unlike a judge or a jury, the defendant has an incentive to claim, in retrospect, that

11

the result of the plea process would have been different regardless of whether that claim is, in fact, true. *Cf. Lee v. United States*, 137 S. Ct. 1958, 1967 (2017) ("Courts should not upset a plea solely because of post hoc assertions from a defendant about how he would have [pled] but for his attorneys' deficiencies."). Thus, to prevent criminal defendants with bargainer's remorse from simply claiming they would not have taken a deal but for a bit of bad advice, we require defendants asserting deficiencies in the plea-bargaining process to provide evidence of their sincerity. *See id.* ("Judges should . . . look to contemporaneous evidence to substantiate a defendants' expressed preferences."). That is to say, when deficient performance causes a defendant to accept a plea bargain he might not have otherwise, the defendant must point to evidence that demonstrates a reasonable probability that, with an accurate understanding of the implications of pleading guilty, he would have rejected the deal.

B.

Here, we conclude that the district court erred by giving dispositive weight to limited language from Appellant's plea agreement. The district court twice concluded (and the Government maintains) that Appellant could not (and according to the Government cannot) demonstrate prejudice because a single line in his plea agreement -- that is, "[Appellant] wants to plead guilty regardless of any immigration consequences that defendant's plea may entail, even if the consequence is the defendant's automatic removal from the United States" -- undermines his assertion that he would not have pled guilty had he known he would be deported. J.A. 108. Instead of weighing evidence that Appellant would have rejected the plea agreement had he known it carried a consequence

12

of mandatory deportation against the evidence that Appellant would have accepted it nonetheless, the district court found that single line "dispositive." *Id.* at 198. We disagree.

Giving dispositive weight to boilerplate language from a plea agreement is at odds with *Strickland*'s fact-dependent prejudice analysis. To determine whether a defendant was prejudiced by an attorney error, *Strickland* requires courts to undertake an individualized examination of the proceedings in which the error is alleged. *See Strickland*, 466 U.S. at 691–96; *cf. id.* at 693 ("[Attorney errors] cannot be classified according to likelihood of causing prejudice."). The prejudice analysis in the context of the plea-bargaining process requires a fact-based evaluation of the weight of the evidence. *See, e.g.*, *Premo v. Moore*, 562 U.S. 115, 129–130 (2011) (rejecting a "per se rule of prejudice"). Accordingly, a categorical rule affording dispositive weight to a prior statement is "ill suited to an inquiry that . . . demands a 'case-by-case analysis.'" *Lee*, 137 S. Ct. at 1966 (quoting *Williams v. Taylor*, 529 U.S. 362, 391 (2000)). In *Lee*, the Supreme Court rejected the Government's invitation to find that a defendant with no viable defense can *never* show prejudice resulting from the denial of his right to trial. *See id.* There is no reason to believe the Supreme Court would be more willing to find that a defendant who affirmed, by means of boilerplate plea agreement language, that he would have pled guilty regardless of any immigration consequences can *never* demonstrate that he would have rejected the deal but for his counsel's ineffective assistance.

Indeed, the weight the district court accorded Appellant's plea agreement cannot be squared with this court's decision in *Swaby*. Swaby's plea agreement included nearly

13

identical language to that at play here: "[C]onviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States . . . . Defendant understands that no one, including his attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any potential immigration consequences." *See Swaby*, 855 F.3d at 237 (alterations in original). Nonetheless, this court found that Swaby demonstrated prejudice. Rather than simply consider the boilerplate language included in Swaby's plea agreement dispositive, we weighed that language against Swaby's connections to this country. *See id.* at 243. After doing so, we concluded it was not only "reasonably likely" but also "unsurprising" that Swaby, had he known the true consequences of his guilty plea, "would have taken any chance, *no matter how slim*, to avoid deportation." *Id.* at 244 (emphasis in original).[4]

---

[4] Views may diverge among the circuit courts as to the weight to accord to these plea provisions. Although the Third Circuit has found a provision that indicates that a defendant "was willing to plead guilty even if that plea would lead to automatic deportation" to destroy a defendant's assertion of prejudice, at least when the defendant repeats the same intention to the district court in his plea colloquy, *see United States v. Fazio*, 795 F.3d 421, 427 (3d Cir. 2015), the Ninth Circuit gives such provisions "little weight," allowing defendants to demonstrate prejudice notwithstanding a plea agreement provision nearly identical to Appellant's, *see United States v. Rodriguez-Vega*, 797 F.3d 781, 785, 789–90, 790 n.9 (9th Cir. 2015). And like the Ninth Circuit, the Eighth Circuit recently found a defendant's affirmations, made in his plea agreement and at his plea hearing, that he understood his plea "could affect" his immigration status did not conclusively indicate that the defendant would not have pled guilty but for his counsel's incorrect immigration advice. *See Dat v. United States*, -- F.3d --, 2019 WL 1562570, at *3 (8th Cir. Apr. 11, 2019).

To be sure, language from plea agreements and statements made during plea hearings are not irrelevant. *See United States v. Lemaster*, 403 F.3d 216, 221–22 (4th Cir. 2005) ("[I]n the absence of extraordinary circumstances, the truth of sworn statements made during a Rule 11 colloquy is conclusively established, and a district court should, without holding an evidentiary hearing, dismiss any § 2255 motion that necessarily relies on allegations that contradict the sworn statements."). But plea agreement language and sworn statements must be considered in their context: When a defendant has been told -- multiple times -- that immigration consequences are not mandated but merely a "possibility," a willingness "to plead guilty regardless of any immigration consequences" does not mean that the defendant was willing to plead guilty if doing so meant *mandatory* deportation. *Cf. United States v. Rodriguez-Vega*, 797 F.3d 781, 790 n.9 (9th Cir. 2015) ("[T]he effectiveness of th[e] written warning was substantially diminished by the context in which it was given, *i.e.* the oral statements by [the defendant's] counsel and the court that [the defendant] faced only a possibility of removal."). The mere utterance and existence of such statements and language -- without context -- cannot conclusively determine that a defendant would have pled guilty regardless of the immigration consequences of doing so.

## C.

The question that remains, then, is whether, considering the weight of the evidence, Appellant satisfied his burden to demonstrate a reasonable probability that, without his counsel's deficient performance, he would not have pled guilty. To do so, Appellant need not demonstrate that rejecting the plea agreement was "the best objective

15

strategy or even an attractive option." *Swaby*, 855 F.3d at 244. He need only demonstrate that, from the perspective of a reasonable person in his position, rejecting the plea agreement would have been "rational." *Id.* Often, "deportation is an integral -- indeed, sometimes the most important part -- of the penalty that may be imposed on noncitizen defendants who plead guilty." *Padilla v. Kentucky*, 559 U.S. 356, 364 (2010). To be sure, "preserving [a] client's right to remain in the United States may be more important to the client than any potential jail sentence." *Id.* at 368. Accordingly, to determine whether a particular defendant would have rejected a plea deal, we look to evidence regarding what is important to the defendant asserting the ineffective assistance claim. *See, e.g.*, *Swaby*, 855 F.3d at 244.

The record here leaves little doubt that avoiding deportation was Appellant's main priority. Appellant retained Martell because he believed she had immigration experience: Indeed, Martell held herself out as being uniquely experienced in matters of immigration. Appellant told Martell that he was determined to fight deportation: Martell acknowledged that she and Appellant discussed immigration extensively, that Appellant "expressed his desire to fight his immigration case," and that she informed Appellant that he had to "fight his case" in immigration court. J.A. 98. Appellant also endeavored to retain his immigration-related rights: Drafts of the plea agreement demonstrate that Appellant and Martell were focused on immigration consequences during the negotiation process. Toward that end, Martell wrote herself a note to "[a]sk to omit immigration waivers" and negotiated to omit sections such as "Consent Given for Removal from the United States" and "Waiver of Rights Related to Removal from the United States." *Id.* at

16

108–109. Had Appellant truly intended to plead guilty to an offense even if it triggered mandatory deportation, he would have had little reason to pursue these negotiations.

Moreover, Appellant's mother, fiancée, and fiancée's mother asked Martell about the immigration consequences of his conviction and sentence. When Appellant's fiancée asked Martell if Appellant's sentence of 24 months would affect his residency, Martell responded, "[N]o because [Appellant] had been a resident for over twenty years that would help him stay here." J.A. 68. Consistent with this statement, Appellant's fiancée's mother averred that Martell said, "because [Appellant] had already been here for over twenty years, he would not be deported." *Id.* at 70.

Most significantly, Appellant has lived in the United States since he was seven years old. His family and his life are here in the United States. And according to Appellant, "[i]f [he] had known that by pleading guilty [he] would be deported from this country, [he] would have asked for a jury trial and tried to win [his] case even if the chances of winning might be small and [he] might get more prison time." J.A. 65.

Appellant's affirmations that he understood that he might be deported do not outweigh the evidence that avoiding deportation was more important to Appellant than any jail sentence. The district court understood the sentence "defendant wants to plead guilty regardless of any immigration consequences that defendant's plea may entail, even if the consequence is the defendant's automatic removal from the United States," to directly contradict Appellant's position that, had he known his plea carried a mandatory-deportation consequence, he would not have taken it. J.A. 199. But the sentence is not that definitive. The sentence includes the equivocal phrases "may entail" and "even if."

17

Moreover, the line before this sentence underscores the qualifying language: "[t]he defendant recognizes that pleading guilty *may* have consequences with respect to defendant's immigration status if defendant is not a citizen of the United States." Supp. J.A. Vol. I at 10 (emphasis added). These statements simply do not suggest that *mandatory* deportation would *not* have changed Appellant's mind. This is even more clear when considered in conjunction with the advice Appellant was receiving. Of course Appellant was willing to sign a plea agreement that said he "wants to plead guilty regardless of any immigration consequences" when he had been told -- multiple times -- that immigration consequences were merely a "possibility."

Nor, for that matter, did the district court's general warning cure any ineffective assistance. Although a district court can, by accurately informing a defendant of the immigration consequences of his plea, cure an attorney's incorrect advice, *see, e.g.*, *United States v. Hernandez-Monreal*, 404 F. App'x 714, 715 (4th Cir. 2011), "general and equivocal" warnings do not suffice, *United States v. Akinsade*, 686 F.3d 248, 240 (4th Cir. 2012). In *Akinsade*, the district court warned the defendant that, because his guilty plea, he "may be deported." *Id.* at 250. We found that warning to be "insufficient to correct counsel's affirmative misadvice" that the defendant's crime "was not categorically a deportable offense." *Id.* at 254. We noted that, although the warning "touch[ed] upon the consequence of deportation," it did not "correct the particular misadvice given by counsel." *Id.* at 255. Here, as in *Akinsade*, the district court's warning that Appellant "may be deported" was insufficient to cure Martell's misadvice that his crime was not a categorically deportable offense. The district court's warning,

18

like the warning at issue in *Akinsade*, was "general and equivocal." *Id.* at 240; *see also Dat*, 2019 WL 1562570, at \*3 (finding a presentence report that noted the defendant would be subject to "Administrative Removal" was insufficient to remedy his attorney's misadvice that he would not be deported). Moreover, it came moments after Martell stated on the record that Appellant faced merely a "[p]ossibility" of deportation. J.A. 16.

The balance of evidence here weighs in favor of Appellant. Appellant prioritized immigration in the plea negotiation process and had a significant reason to do so: avoiding mandatory separation from his family and his home. The qualified statements from Appellant's plea agreement and equivocal affirmations at his plea hearing do not outweigh the evidence that Appellant's main priority was remaining in this country with his family. Accordingly, we find the evidence demonstrates a reasonable probability that, had Appellant known the true and certain extent of the consequences of his guilty plea, he would have refused it.

## IV.

We reverse the district court's judgment and remand to the district court for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*

KING, Circuit Judge, dissenting:

Appellant Sergio Carrillo Murillo confirmed to the district court in June 2016 that he wanted to plead guilty to a drug conspiracy charge, even if the guilty plea resulted in his "automatic removal" (i.e., his deportation) from the United States. *See* Supp. J.A. Vol. I 11. When faced with that very consequence, however, Carrillo had a change of heart and sought to vacate his conspiracy conviction.[1] Carrillo initiated these postconviction proceedings in late 2017, by a 28 U.S.C. § 2255 motion, maintaining that he did not mean what he said to the court in his plea proceedings, and that his then-lawyer was constitutionally deficient. That is, Carrillo now contends that — when he pleaded guilty to a drug conspiracy offense — he did not know that his plea could result in his removal from this country. He thus argues that his Sixth Amendment rights were contravened.

In my view, the district court properly rejected Carrillo's § 2255 motion, and correctly ruled that Carrillo could not prove his Sixth Amendment claim by assertions that directly conflict with his plea agreement and his guilty plea colloquy. Because the majority has endorsed Carrillo's effort to undermine his plea proceedings, I respectfully dissent.

---

[1] I prefer to refer to the appellant as "Carrillo," in that he refers to himself by that name in these proceedings.

# I.

## A.

After driving across the country to purchase a kilogram of cocaine in California and then transport his load of contraband to Virginia, Carrillo was caught red-handed by the federal authorities as he was selling the cocaine for $40,000 to an informant in the Eastern District of Virginia.[2]  As a result of this drug trafficking, Carrillo was indicted for two federal offenses and faced up to eighty years in prison.  In exchange for the dismissal of one of the charges — and to avoid the near certainty of a five-year mandatory minimum sentence for his illegal activities — Carrillo agreed to plead guilty to a single drug conspiracy offense that obviated the mandatory minimum sentence.  He therefore entered into a written plea agreement with the United States Attorney.  As pertinent here, Paragraph 19 of the plea agreement provides:

> [Carrillo] recognizes that pleading guilty may have consequences with respect to [his] immigration status if [he] is not a citizen of the United States.  Under federal law, a broad range of crimes are removable offenses, including the offenses to which [Carrillo] is pleading guilty.  Because removal and other immigration consequences are the subjects of a separate proceeding, [Carrillo] understands that no one, including [his] attorney or the District Court, can predict to a certainty the effect of [this] conviction on [his] immigration status. *[Carrillo] nevertheless affirms that [he] wants to plead guilty regardless of any immigration consequences that [his] plea may entail, even if the consequence is [his] automatic removal from the United States.*

---

[2] According to Carrillo's presentence report, the kilogram of cocaine that Carrillo was selling in Virginia originated from the so-called Sinaloa Cartel in Mexico and its former notorious leader, Joaquín "El Chapo" Guzmán.

*See* Supp. J.A. Vol. I 10-11 (emphasis added). Carrillo and his lawyer each signed the plea agreement, acknowledging and attesting thereby: (1) that they had "carefully reviewed" the entire plea agreement together, and (2) that Carrillo understood and voluntarily agreed to its terms. *Id.* at 14.

During the guilty plea proceedings conducted in Alexandria on June 21, 2016, the district court placed Carrillo under oath. Carrillo then advised the court that he had reviewed the plea agreement and understood it. He also asserted that he was satisfied with his lawyer's representation. Importantly, Carrillo affirmed to the court that he wanted to plead guilty, notwithstanding that he "may be deported as a result of [his guilty] plea." *See* J.A. 21. After finding that Carrillo was competent to plead guilty and that his plea was knowing, voluntary, and supported by a sufficient factual basis, the court accepted the guilty plea and the plea agreement. And Carrillo received significant benefits from his plea bargain: he was sentenced to only 24 months in prison on the single conviction.

B.

About two months shy of his scheduled release date, Carrillo moved in September 2017 to vacate his conspiracy conviction and sentence, alleging ineffective assistance of counsel in the plea proceedings. In his § 2255 motion, Carrillo alleges that he only learned several months earlier that he would be deported as a result of his conspiracy conviction. He faults his lawyer for failing to advise him that he could be deported as a result of his guilty plea. Contrary to his statements in the plea agreement and at the plea hearing, Carrillo contends in his § 2255 papers that he did not know when he pleaded

22

guilty that a possible consequence of his plea was removal from this country. He also asserts that — if his lawyer had advised him of that consequence — he would not have pleaded guilty.

By its order of June 26, 2018, the district court rejected Carrillo's ineffective assistance claim, concluding that he had not shown prejudice from the alleged deficient performance of his lawyer. That is, the court assumed that the lawyer had erred but was satisfied that Carrillo had failed to show "a reasonable probability that, but for counsel's error, he would not have pleaded guilty and would have insisted on going to trial." *See* J.A. 181-82 (internal quotation marks omitted). In so ruling, the court emphasized that Carrillo had explicitly agreed — quoting from Paragraph 19 — that he wanted "to plead guilty . . . even if the consequence is [his] automatic removal from the United States." *Id.* at 183.

## II.

### A.

I begin with a significant issue that neither the district court nor the panel majority has resolved: whether Carrillo's lawyer performed in a constitutionally deficient manner. Unlike the district court and my good friends in the majority, I would not and do not assume deficient performance by Carrillo's lawyer. To the contrary, I would conclude — without a hearing on Carrillo's 28 U.S.C. § 2255 motion — that Carrillo has failed to show that his lawyer's advice was professionally unreasonable. *See Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Indeed, Carrillo affirmed — under oath — in

23

his guilty plea colloquy that he was pleased with his lawyer's services. And he had good reason to say so — his lawyer negotiated an extraordinary bargain on his behalf. More importantly, there is simply no dispute that Carrillo's lawyer informed him that his guilty plea would make him removable from the United States. *See Padilla v. Kentucky*, 559 U.S. 356, 374 (2010) (holding that "counsel must inform her [criminal defendant] client whether his plea carries a risk of deportation"). And Carrillo confirmed that he understood as much at his guilty plea hearing when he made the solemn declarations that he comprehended the plea agreement and the immigration consequences of his guilty plea. *See United States v. Lemaster*, 403 F.3d 216, 221 (4th Cir. 2005) (emphasizing binding nature of statements made during plea colloquy). I am thus satisfied that the performance of Carrillo's lawyer was not constitutionally deficient, and I would affirm the denial of Carrillo's § 2255 motion on that basis.

B.

Additionally, I would affirm the denial of § 2255 relief because Carrillo failed to show prejudice from the alleged deficient performance of his lawyer. That is, our controlling decision in *United States v. Lemaster*, 403 F.3d 216 (4th Cir. 2005), obliges us to summarily dispose of Carrillo's postconviction assertions that directly conflict with his sworn statements during his Rule 11 colloquy. Relatedly, the Supreme Court's decision in *Lee v. United States*, 137 S. Ct. 1958, 1967 (2017), instructs that we must disregard Carrillo's *post hoc* assertions and instead look to "contemporaneous evidence" of his "expressed preferences" concerning his guilty plea. And that contemporaneous evidence proves that Carrillo wanted to plead guilty regardless of any immigration

24

consequences, including removal. Moreover, the panel majority's reliance on our more recent decision in *United States v. Swaby*, 855 F.3d 233 (4th Cir. 2017), is unconvincing. That is, *Swaby* failed to even mention our earlier *Lemaster* decision, and — insofar as those decisions conflict — we are obliged to follow *Lemaster*.

1.

The Supreme Court has long recognized that a criminal defendant's "[s]olemn declarations in open court [during a plea hearing] carry a strong presumption of verity." *See Blackledge v. Allison*, 431 U.S. 63, 74 (1977). And we have consistently emphasized that important principle when a criminal defendant seeks to attack his guilty plea under § 2255. *See, e.g.*, *Lemaster*, 403 F.3d at 221; *United States v. White*, 366 F.3d 291, 295-96 (4th Cir. 2004). Crucially, in our 2005 decision in *Lemaster*, our former colleague Judge Williams recognized that "courts must be able to rely on [a] defendant's statements made under oath during a properly conducted . . . plea colloquy." *See* 403 F.3d at 221. The *Lemaster* panel thus ruled that "in the absence of extraordinary circumstances, allegations in a § 2255 motion that directly contradict the [defendant's] sworn statements made during a properly conducted Rule 11 colloquy are always palpably incredible and patently frivolous or false." *Id.* (citations and internal quotation marks omitted); *see also White*, 366 F.3d at 297 ("[A] court can summarily dismiss allegations of a [defendant] who attempts to challenge statements made during his plea colloquy or in his plea agreement . . . .").

Pursuant to our *Lemaster* decision, the allegations made by Carrillo in these § 2255 proceedings that contradict his sworn statements during his Rule 11 colloquy are

25

"palpably incredible and patently frivolous or false." *See* 403 F.3d at 221.[3] That proposition covers Carrillo's newly minted assertion that he did not know about the potential deportation consequences of his guilty plea. That assertion conflicts with Carrillo's prior sworn statements that: (1) he had reviewed the plea agreement and understood it (including Paragraph 19); and (2) he wanted to plead guilty even though he "may be deported as a result of [that] plea." *See* J.A. 21. Because Carrillo's prejudice contention rests almost exclusively on a postconviction assertion that is "palpably incredible and patently frivolous or false," I would affirm the district court's denial of § 2255 relief. *See Lemaster*, 403 F.3d at 221.

My friends in the majority, however, do not accept the binding nature of our *Lemaster* decision. They suggest that *Lemaster* merely stands for the proposition that sworn statements during a Rule 11 colloquy are simply "not irrelevant" to the prejudice analysis. *See ante* 15. *Lemaster* makes it clear, however, that we should afford controlling weight to such solemn statements. *See* 403 F.3d at 221; *see also White*, 366 F.3d at 295-96. Rather than reject *Lemaster*'s command, I would adhere to its directive — as we are obliged to do. *See United States v. Jones*, 914 F.3d 893, 899 n.6 (4th Cir.

---

[3] Our *Lemaster* decision recognizes an exception for "extraordinary circumstances," which could exist where: (1) the defendant's lawyer admits ineffective representation and the government concedes that the guilty plea was involuntary; or (2) the defendant is "severely ill, both physically and mentally, and uncounseled at the time of his Rule 11 colloquy." *See* 403 F.3d at 221. Neither of those circumstances are present in this case.

2019) (explaining that "one panel of this Court is not entitled to overrule another panel" (internal quotation marks omitted)).

2.

Twelve years after our *Lemaster* decision, the Supreme Court, in *Lee v. United States*, 137 S. Ct. 1958 (2017), reconfirmed the significance of a defendant's statements during guilty plea proceedings. As the Chief Justice explained therein, "[c]ourts should not upset a [guilty] plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies." *Id.* at 1967. Instead, as the Court emphasized, "[j]udges should . . . look to contemporaneous evidence to substantiate a defendant's expressed preferences" in relation to a guilty plea. *Id.*

Carrillo's attestations in Paragraph 19 of the plea agreement and during the guilty plea colloquy are the best "contemporaneous evidence" of his "expressed preferences" regarding his guilty plea. *See Lee*, 137 S. Ct. at 1967; *see also id.* at 1967-68 (emphasizing defendant's assertion during plea colloquy that immigration consequences impacted his decision to plead guilty). This contemporaneous evidence proves beyond peradventure that Carrillo wanted to plead guilty, even if the plea and conviction resulted in his "automatic removal" from this country. *See* Supp. J.A. Vol. I 11. The majority, however, abandons that evidence and instead relies on Carrillo's *post hoc* assertions — the precise type of evidence that the Supreme Court warned us about and rejected in *Lee*. Contrary to *Lee* (and our *Lemaster* precedent), the majority primarily predicates its ruling on the postconviction statements of Carrillo and his supporters. *See ante* 17. But those *post hoc* assertions directly conflict with the "contemporaneous evidence" of Carrillo's

27

"expressed preferences" to plead guilty regardless of any immigration consequences, including removal. *See Lee*, 137 S. Ct. at 1967. Consequently, Carrillo's *post hoc* evidence has no role to play in the analysis of his ineffective assistance claim.

3.

Finally, I disagree with the proposition that our more recent decision in *United States v. Swaby*, 855 F.3d 233 (4th Cir. 2017), authorizes us to disregard Paragraph 19, which explicitly provides that Carrillo wanted "to plead guilty regardless of any immigration consequences that [his] plea may entail, even if the consequence is [his] automatic removal from the United States." *See* Supp. J.A. Vol. I 11; *see also ante* 13-14. Although my good colleagues observe that the *Swaby* plea agreement contained a provision similar to Paragraph 19, they fail to recognize that the *Swaby* analysis did not acknowledge that provision. *See Swaby*, 855 F.3d at 240-44. Accordingly, *Swaby* provides no guidance concerning the importance of Paragraph 19 to the proper assessment of this case.[4]

Of additional importance, *Swaby* did not mention *Lemaster*. It also did not recognize or address the principle that a criminal defendant is generally precluded from attacking a guilty plea through a postconviction assertion that contradicts his statements

---

[4] My friends in the panel majority also relegate Paragraph 19 to the dustbin because, according to their opinion, that provision is "boilerplate [plea agreement] language." *See ante* 13, 14. The majority thus suggests that a plea agreement provision that shows up frequently can simply be disregarded in postconviction proceedings. If there is decisional authority to support such a proposition, I have found none. I would speculate, however, that Paragraph 19 resulted from the Supreme Court's *Padilla* decision.

to the court in his plea colloquy.  *See Lemaster*, 403 F.3d at 221.  And if *Swaby* and *Lemaster* conflict in that respect, *Lemaster* must control our analysis.  *See McMellon v. United States*, 387 F.3d 329, 333 (4th Cir. 2004) (en banc) ("When published panel opinions are in direct conflict on a given issue, the earliest opinion controls, unless the prior opinion has been overruled by an intervening opinion from this court sitting en banc or the Supreme Court.").  Again, *Lemaster* requires us to disregard Carrillo's § 2255 postconviction assertions attacking his solemn statements to the district court in his guilty plea proceedings.  As a result, it is clear to me that Carrillo's § 2255 motion was appropriately rejected.

For these reasons, I would affirm the district court.  Because my good colleagues rule otherwise, I respectfully dissent.